433 So.2d 1233 (1983)
POLK NURSERY COMPANY, INC., and Florida Farm Bureau Casualty Insurance Company, Appellants,
v.
Connie L. RILEY and Carolyn L. Lord, Appellees.
Nos. AM-284, AM-285.
District Court of Appeal of Florida, First District.
June 17, 1983.
Rehearing Denied July 21, 1983.
A.H. Lane and John K. Vreeland of Lane, Trohn, Bertrand & Williams, Lakeland, for appellants.
*1234 Michael B. Murphy of Stanley, Wines, Bennett, Murphy & Spanjers, Auburndale, for appellees.
BOOTH, Judge.
This cause is before us on consolidated appeals from orders in workers' compensation proceedings, awarding compensation benefits for physical and psychiatric injuries claimed to have resulted from poisoning by the organic pesticide "Temik."
On July 20, 1981, Connie Riley and Carolyn Lord suddenly became ill while fertilizing potted plants which had been treated three and a half weeks previously with the highly toxic pesticide Temik. Claimants assert that they were exposed to the pesticide when their tennis shoes were soaked with water which had pooled on the black plastic placed under the potted plants.
There was no evidence introduced that there was Temik in the water which allegedly soaked claimants' shoes. However, claimants sought to establish these claims under the "logical cause" doctrine by showing the onset of symptoms of Temik poisoning following claimants' presumed exposure to that chemical during work.
The active ingredient in Temik is the organophosphate pesticide "aldecarb." Aldecarb is combined with an inert ingredient to form a granular substance which is placed on the soil at the base of the plant. Upon watering, the pesticide is leached into the soil surrounding the roots and is internally absorbed by the plant; the plant pest is destroyed as a result of eating some portion of the plant.
Expert testimony established that the action of Temik's active ingredient aldecarb is to reduce the body's cholinesterase level, thus interfering with the parasympathetic nervous system which controls the involuntary body functions. In humans, exposure to aldecarb results in the victim losing control over his body functions, with symptoms that include headache, nausea, abdominal cramps, tightness in the chest, pinpoint pupils and blurred vision, vomiting, excessive salivation and tearing, sweating, diarrhea, incontinence, weakness, muscle twitching, pulmonary edema, convulsions and, if the cholinesterase level is sufficiently reduced, coma and death. It is a unique feature of this pesticide that a minimal exposure, that is an exposure which does not result in a significant lowering of the cholinesterase level, is asymptomatic and is without physical consequences or residual effects. On the other hand, an exposure sufficient to produce a significant lowering of the cholinesterase level will typically cause the entire complex of symptoms to appear.
There was no testimony to support the deputy's apparent determination that claimants sustained a slight case of Temik poisoning. On the contrary, the expert testimony seemed to effectively negate the possibility of such a theory due to the unique action of the chemical in question.
Riley and Lord complained of weakness, headache, nausea, dizziness, blurred vision and abdominal cramps. Serum and whole blood tests showed both claimants' cholinesterase levels to be within normal limits. The physicians who examined them soon after they became ill found no objective physical evidence that they had been poisoned by Temik and concluded that they had suffered no physiological injury, but that there was some emotional component to their symptoms.
Both claimants were referred to Dr. Susac for neurological evaluation on the date of the accident. Dr. Susac found no objective evidence that they had been exposed to Temik poisoning and was of the opinion that any possible exposure would have had to have been minimal. Claimants were then seen by psychiatrists who attributed their continuing symptoms and depression to a psychological trauma produced by fear that they had been poisoned by Temik.
In September, 1981, both claimants were examined, at the request of the carrier, by Dr. Bergnes, an internist. He had before him the claimants' medical reports and the cholinesterase blood tests made on the date of the incident. He found the results of the blood tests to be within normal limits, indicating that any exposure to Temik was *1235 insignificant. Dr. Bergnes found no objective evidence of any residual physiological effects from any exposure to Temik.
Dr. Gessner, a clinical psychologist and clinical neuropsychologist, examined both claimants on several occasions in November, 1981, conducting a series of psychological and neuropsychological tests. He concluded that Riley's subjective symptoms were not caused by the presence of any toxic substance, but resulted from the fear that she had been poisoned. He found that Lord was a passive person who tended to be suggestible, that she suffered from an anxiety syndrome with depression which most probably related to a preexisting condition, and that there was no indication of any toxic condition caused by Temik which contributed physiologically to her subjective symptoms, concluding that she perceived that she was poisoned and thereafter developed the symptoms.
Dr. Reavis, an anatomical, clinical and forensic pathologist, reviewed the medical records and depositions, and found no objective evidence that claimants had been poisoned by Temik. Dr. Reavis was of the opinion that neither of the claimants had absorbed any of the pesticide. He noted that affected persons do not become symptomatic until their cholinesterase levels have fallen to approximately 40 percent of the normal level and concluded that, if claimant's symptoms had been caused by Temik poisoning, their cholinesterase levels would not have returned to normal during the interval between the alleged exposure and the blood tests. In his opinion, it was unlikely that claimants absorbed Temik through the soles of their feet because of the calloused nature of the skin in that area and because of the lesser blood flow in the lower extremities.
In a pair of similar orders, the deputy rejected testimony by Mary Rogers, claimants' supervisor, which conflicted with claimants' testimony regarding the existence of standing water on the black plastic and the presence of two other women in the same plant bed at the same time as claimants who did not become ill. He also rejected the testimony of Dr. Reavis as "at best inconclusive." He found that claimants' testimony, corroborated by the hospital and medical reports, indicated symptoms consistent with organophosphate exposure, that their theory of exposure to Temik by absorption through their feet presented the only logical explanation for their physical and emotional symptoms, and that "there was no evidence to support any other conclusion except that claimant[s] did receive an organic injury from the Temik." He found that, while claimants' present depression and anxieties were not directly related to exposure to Temik, they were triggered by the "highly anxiety-provoking experience" of the poisoning episode, that the depositions of Dr. Gomez and Dr. Gessner supported this finding, and that "there was no other evidence to rebut a causal relationship between the accidental poisoning and the claimants' present psychiatric problems." The deputy awarded compensation benefits and medical treatment, based in part upon findings that the claimants' injuries were "actually caused by employment conditions characteristic and peculiar to this particular occupation," and that the occupation "presents a particular hazard for this type of accidental injury."
We hold that the deputy's order is not supported by competent, substantial evidence and contains findings which, on the record before us, are erroneous.
The collective and uncontroverted testimony of all the examining, treating and consulting physicians was that there were no objective symptoms to support a finding that claimants were poisoned. Nonetheless, the deputy found that the initial diagnosis of poisoning, a diagnosis made based on the claimants' statements of exposure and non-specific subjective symptoms, was never rebutted. Despite the competent and extensive medical testimony that claimants' symptoms were induced by fear of exposure to Temik, the deputy found that poisoning offered the only logical and reasonable explanation for the claimants' symptoms.
Even were we to assume that claimants presented a logical explanation for their *1236 physical symptoms and "nervous injuries," thereby shifting the burden of proof to the employer/carrier to show a more logical cause for their injuries under the "logical cause doctrine," the employer/carrier has met its burden by expert testimony supporting an explanation of the cause of claimants' symptoms as a hysterical reaction to possible exposure to a chemical claimants had been warned was "deadly poison," and by substantial evidence negating poisoning as a cause. The deputy's findings that there was no medical testimony or other evidence to support a theory of "sympathetic illness," that "the initial diagnosis of poisoning was never rebutted and offers the only logical and reasonable explanation for the claimants' physical and emotional symptoms," and that "there was no evidence to support any other conclusion except that claimants did receive an organic injury from Temik" are thus erroneous.
Furthermore, we find that the deputy abused his discretion in rejecting extensive, uncontroverted medical testimony without a reasonable explanation. The record contains no substantial conflict in the medical testimony, nor do we discern a conflict between claimants' testimony and the employer/carrier's theory of a psychological reaction to a perceived but non-existent poisoning.
Although the evidence presented establishes that Riley and Lord suffered anxiety and depression as a result of their belief that they had been poisoned, a neurotic disability is not compensable unless there is an actual physical injury. Section 440.02(18), Florida Statutes (previously Section 440.02(19), Florida Statutes); City Ice & Fuel Division v. Smith, 56 So.2d 329 (Fla. 1952); Superior Mill Work v. Gabel, 89 So.2d 794 (Fla. 1956). In order for the claimants to have sustained a compensable injury some physical trauma or organic injury, even if relatively minor, must be found to have occurred. Oolite Concrete Co. v. Carver, 145 So.2d 733 (Fla. 1962); Prahl Brothers, Inc. v. Phillips, 429 So.2d 386 (1st DCA, 1983).
The record in this case does not support a finding of compensable injury by accident arising out of and in the course of employment within the meaning of Section 440.02(18), Florida Statutes, since no physical injury has been shown by the evidence, but only a psychological trauma caused by fear and excitement which in turn produced physical symptoms consistent with a hysterical reaction. Analogous situations might include work-connected exposure to disease germs, without physical consequences, and subsequent psychological distress upon being made aware of the exposure, with accompanying physical symptoms. Absent a causal link between a physical trauma, however slight, and subsequent nervous or mental injury, Section 440.02(18), Florida Statutes, excludes such injuries, due to fright or excitement only, from those injuries compensable under the Workers' Compensation Law. Williams v. Hillsborough County School Board, 389 So.2d 1218 (Fla. 1st DCA 1980); Davis v. Sun Banks of Orlando, 412 So.2d 937 (Fla. 1st DCA 1982).
The deputy's order is reversed and the cause remanded with directions to dismiss the claims.
WIGGINTON and NIMMONS, JJ., concur.